IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PRINCIPAL LIFE INSURANCE CO.,       CV 00-1345-BR
an Iowa corporation; PETULA
ASSOCIATED LTD., an Iowa            VERDICT, FINDINGS
corporation; and EQUITY FC           OF FACT, AND
LTD., an Iowa corporation,          CONCLUSIONS OF LAW

      Plaintiffs,

v.

CONSTANCE A. ROBINSON;
CHESTER L. ROBINSON,
individually and as trustee
of the Chester Robinson Trust;
LYNN ROBINSON; KAY BELL;
THEA WOOD; and DEE HANSON,

      Defendants.

MARGARET B. STERN
J. STEPHEN WERTS
Cable Huston Benedict Haagensen & Lloyd
1001 S.W. Fifth Avenue
Suite 2000
Portland, OR 97204-1136
(503) 224-3092

      Attorneys for Plaintiffs

1 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

**LAINIE F. BLOCK**
**JULIE R. VACURA**
Larkins Vacura, LLP
808 S.W. Third Avenue
Suite 450
Portland, OR 97204
(503) 222-4424

       Attorneys for Defendants


**BROWN, Judge.**

      This matter comes before the Court following a bench trial on November 7-8, 2006, on the First and Second Counterclaims of Defendants Constance A. Robinson; Chester L. Robinson, individually and as trustee of the Chester Robinson Trust; Lynn Robinson; Kay Bell; Thea Wood; and Dee Hanson (the Robinsons).[1]

      For the reasons that follow, the Court concludes the Robinsons have failed to prove either of their Counterclaims by clear and convincing evidence, and, therefore, they are not entitled to reformation of the Ground Lease at issue in this matter.

---

    [1] Plaintiffs initially brought this action against Constance A. Robinson; Chester L. Robinson; Evelyn Z. Robinson; Michael W. Robinson; and Constance A. Robinson, as personal representative of the Estate of William R. Robinson. Plaintiff's First Amended Complaint terminates Evelyn Z. Robinson, Michael W. Robinson, and the Estate of William R. Robinson as Defendants and adds as Defendants Chester L. Robinson, as trustee of the Chester Robinson Trust; Lynn Robinson; Kay Bell; Dee Hanson, and Thea Wood. In their First Amended Complaint, Plaintiffs state William and Evelyn Robinson are deceased and that Chester Robinson assigned all of his interest in the Ground Lease to the Chester Robinson Trust. Lynn Robinson, Bell, Hanson, and Wood all acquired interests in the property at issue through transfers from the Chester Robinson Trust.

**BACKGROUND**

Plaintiffs, three Iowa corporations, brought this action on September 29, 2000, against Defendants Constance A. Robinson; Chester L. Robinson, individually and as trustee of the Chester Robinson Trust; Lynn Robinson; Kay Bell; Thea Wood; and Dee Hanson.  Plaintiffs sought a declaratory judgment concerning the proper interpretation of the rent-adjustment clause in a 99-year Ground Lease to which Plaintiffs are successor-in-interest lessees and the Robinsons are successor-in-interest lessors. Although Plaintiffs acknowledged Section 2.1 of the Ground Lease provided for an adjustment to the percentage used in calculating monthly rental payments in the 31st and 61st years of the Ground Lease, Plaintiffs sought a declaration that Section 2.1 did not also provide for re-evaluation of the per-acre value of the land as contended by the Robinsons.

The Robinsons moved for summary judgment on the ground that the matter was not ripe for a judicial declaration, and, therefore, the Court lacked subject-matter jurisdiction.  The Court agreed with the Robinsons and granted their Motion on September 26, 2002.

Plaintiffs appealed the Court's decision to the Ninth Circuit Court of Appeals.  On January 6, 2005, the Ninth Circuit reversed and remanded the matter to this Court. *See Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2005).

3 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

On remand, Plaintiffs moved for summary judgment.  On February 27, 2006, this Court granted Plaintiffs' Motion and held Section 2.1 of the Ground Lease unambiguously provides for a re-evaluation of the percentage used to calculate rent in the 31st and 61st years, but does not require re-evaluation of any other part of the rent-calculation formula, including the per-acre value of the land.  The Court also granted the Robinsons leave to file an amended answer and to raise any available counterclaims.

On March 6, 2006, the Robinsons filed their Amended Answer and asserted Counterclaim One seeking reformation of the Ground Lease based on mutual mistake and Counterclaim Two seeking reformation of the Ground Lease based on unilateral mistake.

At the heart of both Counterclaims is the Robinsons' contention that Section 2.1 of the Ground Lease should have included a provision to adjust the land value used to calculate monthly rental payments and the absence of such a provision was a fundamental mistake.  In particular, the Robinsons contend the final form of the Ground Lease should be reformed because it was either the product of a mutual mistake or, in the alternative, a unilateral mistake as to which Plaintiffs' predecessor-in-interest inequitably took advantage.

In response, Plaintiffs contend there is not any evidence of a mutual or unilateral mistake at the time the Ground Lease was

4 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

executed, and, even if there was a mistake, the Robinsons are barred from asserting their Counterclaims by Or. Rev. Stat. § 12.140 (10-year statute of limitations), waiver, estoppel, and/or laches.

The Court held a bench trial of the Robinsons' Counterclaims on November 7-8, 2006.

## VERDICT

The Court has weighed and evaluated all of the evidence presented at trial and has completed its deliberation.  Based on its Findings of Fact and Conclusions of Law made pursuant to Fed. R. Civ. P. 52(a) as set forth below, the Court concludes the Robinsons have failed to prove either of their Counterclaims by clear and convincing evidence, and, therefore, the Robinsons are not entitled to reformation of the Ground Lease.  Accordingly, the Court does not reach Plaintiff's defenses.

## STANDARDS

The Court has diversity jurisdiction over the Robinsons' Counterclaims brought under Oregon common law.  When deciding issues of Oregon law, this Court must interpret and apply state law as the Oregon Supreme Court would apply it.  *See S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001).  If there is not a decision by the Oregon Supreme

5 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

Court to guide the Court's interpretation of state law, the Court must predict how the Oregon Supreme Court would decide the issue by using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. *Id.*

Under Oregon law,

> [t]he parties seeking reformation of a written contract must establish, by the appropriate quantum of proof, (1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence.

*Jensen v. Miller*, 280 Or. 225, 228-29 (1977). *See also Webb v. Culver*, 265 Or. 467, 470 (1973).  The required quantum of proof is clear and convincing evidence. *Jensen*, 280 Or. at 229 n.1. *See also Pioneer Res., LLC v. D.R. Johnson Lumber Co.*, 187 Or. App. 341, 364 (2003).

**A.    <u>Antecedent Agreement</u>.**

To find an antecedent agreement, the Court must conclude the original lessors and lessees, prior to executing the final, written version of the Ground Lease, "reached a complete mutual understanding with respect to all of the essential terms of their agreement, for otherwise there would be no standard by which the writing could be reformed." *See Manning Lumber Co. v. Voget*, 188

Or. 486, 500 (1950).

**B.    Mutual Mistake or Unilateral Mistake.**

**1.    Mutual Mistake.**

To find a mutual mistake, the Court must conclude the original lessors and lessees mistakenly signed a lease (specifically, the Ground Lease in this case) that did not reflect their actual, mutual intent and "the [mistake] must have been [made] in the drafting of the instrument and not in the making of the contract." *See Interior Elevator Co. v. Limmeroth*, 278 Or. 589, 597 (1977). *See also Manning Lumber Co.*, 188 Or. at 500.

**2.    Unilateral Mistake.**

Alternatively, for the Court to find a unilateral mistake, "it is necessary that there be a mistake, that the mistake is basic and known to the other party, or that circumstances are such that the other party, as a reasonable person, should have known of the mistake." *See Gardner v. Meiling*, 280 Or. 665, 674 (1977).  The Court must also conclude the non-mistaken party engaged in some kind of inequitable conduct knowing the other party was mistaken. *See Jensen*, 280 Or. at 228-29.

**C.    Gross Negligence.**

Finally, in order to reform the Ground Lease, the Court must conclude the Robinsons were not guilty of gross negligence at the

time the Ground Lease was signed.  *See Jensen*, 280 Or. at 228-29.

Conduct that constitutes gross negligence "must go beyond mere

oversight, inadvertence, or mistake and, instead, must amount to

a degree of inattention that is inexcusable under the circum-

stance[s]."  *Foster v. Gibbons*, 177 Or. App. 45, 54 (2001)(citing

*Wolfgang v. Henry Thiele Catering Co.*, 128 Or. 433, 444 (1929)).


## FINDINGS OF FACT

The following facts are undisputed or, when disputed, the

Court has weighed and evaluated the disputed evidence and made

findings of fact by clear and convincing evidence:

1.  Plaintiffs, three Iowa corporations, are successors-in-

interest lessees under a Ground Lease of certain real property in

Washington County, Oregon.  The original lessors under the Ground

Lease were Chester, Constance, Evelyn, and William Robinson.

2.  The real property in question is 44.46 acres of a 160-

acre parcel that has been in the Robinson family since 1866.

3.  By 1977 the 44.46 acres were owned by William and

Constance Robinson, husband and wife, and Chester and Evelyn

Robinson, husband and wife.  William and Chester Robinson are

brothers.  William Robinson died in 1988.  Evelyn Robinson also

died after the Ground Lease was executed.  Michael Robinson is

the son of William and Constance Robinson.

4.  In 1977 and 1978, William Robinson represented his

family in negotiations that led to the Ground Lease.  William Robinson was an intelligent, experienced businessman and part-time farmer who held a real-estate license and engaged in several personal real-estate transactions.  He was active in local politics and business-development issues.  Although the evidence does not reflect William's date of birth, he was younger than his brother Chester, who was born in 1918.  Thus, when William Robinson negotiated the Ground Lease, he likely was in his 50s.

5.  William Robinson negotiated the Ground Lease with Terry L. Brandt.  In 1977, Brandt was in his 20s.  When Brandt first met William Robinson, Brandt was working for Prudential Insurance Company in connection with developing commercial real estate.  Brandt learned the Robinsons were interested in leasing the 44.46 acres via a long-term ground lease whereby a lessee would develop the property commercially while the Robinsons retained ownership of the land.  At the time, the land was unimproved and in a prime location for commercial development near a new freeway.  After preliminary discussions with William Robinson, Brandt presented the lease opportunity to his employer.  Prudential, however, was not interested.

6.  Brandt thought the opportunity was worth pursuing on his own and left Prudential in order to do so.  In particular, Brandt wanted to acquire the right to develop the property.  He continued to discuss the concept with William Robinson.  As a

9 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

young, first-time developer, however, Brandt did not have the
means to finance such a project.  Brandt turned to Andy Anderson,
who was capable of providing the necessary financing.  Brandt
continued to negotiate with William Robinson on behalf of himself
and Anderson.

7.  On September 15, 1977, an Earnest Money Receipt and
Lease Option Agreement (Agreement) was signed by William and
Chester Robinson as lessors and by two entities associated with
Anderson and Brandt as lessees.  The Agreement contemplated the
parties would enter into a 99-year ground lease with two 25-year
lease-renewal options and with purchase options in the 31st and
61st years.

8.  As to rent, the Agreement provided as follows:

> The annual yearly rental during the
> primary term of ninety-nine (99)
> years is to be payable in equal
> monthly installments on the first
> day of each and every month for
> said term of the Lease and is to
> be an amount equivalent to the
> percent of the aggregate cost of
> the initial gross acreage based
> upon a predetermined cost of
> Twenty-two Thousand Dollars
> ($22,000.00) per acre, which
> percentage is set out below:

| DURING LEASE YEAR | Percentage of Total Initial Gross Acreage Cost Based On $22,000 Per Acre |
|---|---|
| 1 | 6% |
| 2 | 6% |
| 3 | 8% |
| 4 | 8% |
| 5 – 30 | 10% |
| 31 – 60 | To be Determined |
| 61 – 99 | As Set Forth Below |

At the commencement of the 31st year of the term of the Lease, the percentage to be used for determining the rent, as computed above, for the 31st through 60th years of the Lease term, shall be re-evaluated; and, again, at the commencement of the 61st year of the Lease term, the percentage to be used for determining the rent, as computed above, for the 61st through 99th years of the Lease term, shall be re-evaluated.  Upon each re-evaluation of the percentage, the percentage to be used shall be the ratio between the rental charged and the then fair market value of properties which are comparable to the leased Premises, exclusive of any value or rent attributed to improvements on the property.  The percentage to be used shall be determined by an MAI appraisor [*sic*] selected in accordance with the method of choosing an appraiser [*sic*] for purposes of the purchase option price.

9.  There is not any evidence that the parties consulted

11 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

with counsel before entering into the Agreement.  There also is
not any evidence as to who drafted the Agreement.  The Court
notes Brandt's testimony that he likely was not capable at that
time of composing such an instrument.  The Court also notes
William Robinson was experienced in real-estate transactions and
was a licensed realtor who was affiliated with Sam Gotter
Realtors, the "Broker-Escrow Deposit Holder" for the Agreement.
Nonetheless, these facts standing alone are not sufficient for
the Court to draw any firm conclusion as to who drafted the
Agreement and whether the drafting party might be responsible for
any confusion resulting from the language in the Agreement.

     10.  About eight months transpired between the signing of
the Agreement and the signing of the Ground Lease.  In that
period, Andy Anderson's interest in developing the property
changed, and he wanted to withdraw from the project.  Brandt was
unable to proceed alone and invited Mike Duyn, a broker, to find
a new financial source.  Initially Anderson, Brandt, and Duyn
formed "ABD Company."  Later, however, Anderson gave his interest
under the Agreement to his sister, Ruth Jones.  In turn, Duyn,
Brandt, and Jones formed "MTR Company," which is the entity that
ultimately signed as lessee on the Ground Lease.

     11.  In the period between the signing of the Agreement and
the signing of the Ground Lease, MTR Company retained Stephen
Janik as legal counsel.  At the time, Janik was a young lawyer

12 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

approximately four years out of law school who practiced at the
Portland law firm then known as "Davies Biggs." Janik worked
with Brandt directly. There is not any evidence that Janik had
any contact with William Robinson or with anyone else, including
a lawyer, on behalf of the Robinsons. Brandt, in turn, dealt
directly with William Robinson. On occasion, Chester Robinson
was present when William Robinson and Brandt were negotiating the
Ground Lease. On one occasion, Mike Robinson was present when
William Robinson and Brandt were completing the negotiation of
the Ground Lease at his father's home office.

12. Janik drafted Exhibit 3, which is a proposed form of
the Ground Lease that identifies the lessee as "ABD Company." In
this version of the proposed Ground Lease, the rent provisions
appear in "Section 2." Paragraph 2.1 is captioned "Amount of
Rent" and, in turn, has five subparagraphs. Subparagraph 2.1.1
contains blank lines for rent amounts to be paid in years one,
two, three, and four and a single blank line for the amount to be
paid in years five through 30. Subparagraph 2.1.2 sets out the
method for calculating rent during the 31st through 61st years of
the Ground Lease. In particular, Subparagraph 2.1.2 provides for
a method to determine the "then prevailing ratio in the fair
market between ground rent . . . charged and the then fair market
value of property for which such rent is charged." Notably,
Section 2 of this draft does not contain any provision to revalue

the $22,000 per-acre base price.

13. A proposed draft of the Ground Lease in a form identical to Exhibit 3 made its way from Janik to William Robinson. William Robinson reviewed that form of the proposed draft and made handwritten notes about it as follows:

a. Exhibit 4 is a copy of

(1) the outside of a "Davies Biggs" law firm 8" x 10" manila envelope on which William Robinson noted a division of monthly rental income between himself and his brother Chester based on a total monthly figure of $4,890.60;

(2) a lined sheet of notepaper on which William Robinson calculated projected monthly and annual rental income for the first five years of the Ground Lease based on increasing percentages from six percent in years one and two, eight percent in years three and four, and ten percent in years five through 30, and made other calculations concerning "lease income less commission." These calculations appear to reflect that William Robinson would receive more of the monthly rent payment than Chester Robinson to account for a commission to William Robinson;

(3) a single page of William Robinson's handwritten notes that track the page and paragraph number

14 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

references in the proposed draft that is identical to
Exhibit 3; and

(4) a photocopy of what appears to be a one-page
excerpt from a three-page document that seems to
provide standards for payment of lease commissions on
long-term leases.

b.    Exhibit 5 is another copy of the proposed draft of the
Ground Lease in a form identical to Exhibit 3 on which
William Robinson made various handwritten notes and
marks in and around Section 2.  These include hand-
written entries in the blanks for the amount of monthly
rent that correspond to the same figures William
Robinson calculated in the notes copied as page 3 of
Exhibit 4.

14.  William Robinson's notes about his review of the
proposed Ground Lease in the form identical to Exhibit 3 clearly
show he did not accept Subparagraphs 2.1.3 and 2.1.5.  His notes
(page three of Exhibit 4) indicate these subparagraphs are "out."
In addition, William Robinson's notes reflect "22,000 Per A[cre]
not to be used beyond 31[st] year."  Notably, this is the first
documentary corroboration of the Robinsons' contention that
William Robinson always insisted the Ground Lease provide for
recalculation of the rent based on the fair-market value of the
land in the 31st and 61st years as opposed to a percentage of the

15 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

fixed $22,000-per-acre base for the early years of the Ground
Lease.

15.  William Robinson clearly made these notes when he was
negotiating with Brandt, after he signed the Agreement, and
before he signed the final Ground Lease.  Indeed, the same page
of these notes reflects William Robinson's idea that the final
Ground Lease should use language from the Agreement concerning
the calculation of rent.  William Robinson's notes indicate the
Ground Lease should "read as option on Page 2 and 3."  The Court
finds the word "option" in this context refers to the Agreement,
which includes the word "option" in its title and discusses a
proposed rent-payment formula on pages two and three.  The Court
notes, however, the Agreement does not explicitly provide for
recalculation of the rent based on the fair-market value of the
land in future years.

16.  William Robinson's notes also suggest other changes in
various parts of the proposed Ground Lease.  These proposed
changes are incorporated into another, later proposed draft as
depicted in the typed text of Exhibit 6.  In this proposed draft,
the lessee is described as "MTR Company," which shows this draft
was prepared after the form represented by Exhibits 3 and 5.
Moreover, this draft includes typewritten rental figures at the
top of page three that are the same as the handwritten figures
William Robinson noted in his calculations on page three of

16 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

Exhibit 4.

17.  The draft reflected in Exhibit 6, however, inexplicably omits the caption for Section 2, the caption for Paragraph 2.1, and the first three lines of Subparagraph 2.1.1 as they existed in the earlier draft.  Instead the uncaptioned Section 2 begins with a chart that sets forth a typewritten schedule of monthly rent amounts for each of the first four years and for the fifth through 30th years.  There is not any evidence in the record to explain this lapse, and, therefore, the Court does not draw any inference from it.

18.  In addition, the pages of Exhibit 6 are photocopies that include additional handwritten notes of William Robinson.  Clearly these notes were made after the notes reflected in Exhibits 4 and 5 and before William Robinson signed the Ground Lease.  On page three of Exhibit 6, William Robinson placed handwritten brackets around language beginning in the middle of line four of Subparagraph 2.1.2 and ending with the word "Lessor" on line 14 of that same subparagraph.  This passage clearly deals with rent-calculation formulas in the 31st through 61st years and exists in an identical format in Exhibits 3 and 5.  It appears William Robinson also drew a circle around the latter section of the bracketed language and handwrote a word in both margins surrounding this text.  It is unclear whether the word is "Lost" or "Last" and unclear what William Robinson meant in this

17 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

context.  The Court notes this bracketed language also appears in
the text of the final form of the Ground Lease on the bottom of
page four in a different typeface and with different margins and
spacing than the prevailing text in the Ground Lease, which
suggests this language was added to an existing form of the
Ground Lease before it was signed.

19.  Based on all of the documentary evidence and the
convincing testimony of the witnesses with whom William Robinson
spoke both before and after he negotiated and signed the Ground
Lease, the Court is convinced William Robinson always intended
the Ground Lease to provide for a "bump" in rental income in the
31st and 61st years based not only on an updated "percentage" or
ratio figure but also based on a per-acre value different from
the $22,000 figure governing the early years of the Ground Lease
and representing the fair-market value of the land as unimproved
ground in the 31st and 61st years.  The Court also is satisfied
that William Robinson communicated this intent to Brandt during
negotiations leading to the Ground Lease.  Because the rent-
escalation language of the Agreement was made part of the Ground
Lease and neither document reflects that intent, the Court is
convinced William Robinson made a fundamental mistake in
believing both the Agreement and the Ground Lease accomplished
his intent.  The other Robinsons who signed these documents
relied, in turn, on William Robinson's mistaken understanding of

18 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

what the Ground Lease actually provided.

20.  Based on all of the documentary evidence and the testimony of Brandt and Stephen Janik, the Court also is convinced Brandt's original goal when negotiating with William Robinson was to obtain a long-term ground lease with a stable schedule for rent payments because such a condition was necessary to obtain development financing.  Nearly 30 years after the fact and without the benefit of William Robinson's testimony, however, the Court is unable to determine from the evidence as a whole, even by a preponderance of the evidence, whether Brandt surrendered his original goal and capitulated to William Robinson's contrary demands by agreeing to a re-evaluation of the fair-market value of the land in the 31st and 61st years and, therefore, whether Brandt also was mistaken about the fundamental meaning of the "amount of rent" terms of the Ground Lease.

21.  In addition, the evidence is insufficient to permit the Court to determine whether Brandt engaged in any inequitable conduct by executing the Ground Lease while allegedly knowing about William Robinson's mistake.

22.  The final version of Section 2.1 of the Ground Lease provides the formula for adjusting the rental payments in 2008, the 31st year of the Ground Lease, and again in the 61st year as follows:

19 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

2.1  Amount of Rent

Lessee shall pay to Lessor rent in an amount equal to 44.6 acres multiplied by $22,000 per acre and multiplied by the applicable percentages determined in accordance with the following provisions of the Earnest Money Receipt and Lease Option Agreement dated September 13, 1977.

The annual yearly rental during the primary term of ninety-nine (99) years is to be payable in equal monthly installments on the first day of each and every month for said  term of the Lease and is to be an amount equivalent to the percent of the aggregate cost of Twenty-two Thousand Dollars ($22,000) per acre, which percentage is set out below:

| DURING LEASE YEAR | Percentage of Total Initial Gross Acreage Cost Based on $22,000 Per Acre | Which is Rent of |
|---|---|---|
| 1 | 6% | $4,890.60 |
| 2 | 6% | $4,890.60 |
| 3 | 8% | $6,520.80 |
| 4 | 8% | $6,520.80 |
| 15 - 30 | 10% | $8,151.00 |
| 31 - 60 | To be Determined | To be Determined |
| 61 - 99 | As Set Forth Below | As Set Forth Below |

At the commencement of the 31st year of the term of the Lease, the percentage to be used for determining

20 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

the rent, as computed above, for the
31st through 60th years of the Lease
term, shall be re-evaluated; and,
again, at the commencement of the 61st
year of the Lease term, the percentage
to be used for determining the rent,
as computed above, for the 61st
through 99th years of the Lease term,
shall be re-evaluated.  Upon each re-
evaluation of the percentage, the
percentage to be used shall be the
ratio between the rental charged and
the then fair market value of
properties which are comparable to
the leased Premises, exclusive of
any value or rent attributed to
improvements on the property.  The
percentage to be used shall be
determined by an MAI appraisor [*sic*]
selected in accordance with the method
of choosing an appraiser [*sic*] for
purposes of the purchase option price
according to Section 2.1.2.

23.  As noted, the Court granted summary judgment to

Plaintiffs as to the construction of this language and found it

does not provide for any adjustment in the rental income based on

a re-evaluation of the fair-market value of the land except to

the extent necessary to calculate the "percentage" or ratio to

apply to the $22,000 per-acre value.

24.  In 1979 MTR Company assigned its interests and

obligations under the Ground Lease to Koll/Intereal Northwest.

Although this assignment produced a commission to Brandt of

approximately $250,000, the agreement to assign and Brandt's

expectation to receive the commission were already in place when

the parties executed the Ground Lease.  At some later point,

21 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

Koll/Intereal Northwest assigned its interest to Koll/Intereal Portland.

25.  In 1985 the original lessors entered into the First Lease Amendment with Koll/Intereal Portland that provided for increased rent and an option to purchase the property.  In 1986 the original lessors entered into a Second Lease Amendment with Koll/Intereal Portland that allowed Koll/Intereal Portland to divide the leased property into parcels and to assign the parcels to others.  In addition, the Second Lease Amendment adjusted the rental-calculation provision in Section 2.1 of the Ground Lease to reflect various conveyances and a sublease.

26.  During negotiations that led to the Second Lease Amendment, the Robinsons and Koll/International Portland disagreed about the proper calculation of the rent adjustment in Section 2.1 of the Ground Lease.  The parties, as a result, included in the Second Lease Amendment a provision acknowledging their disagreement and expressly preserving each party's right to assert its interpretation of Section 2.1 in the future.  Notably, none of the parties did anything while William Robinson was still alive to perpetuate the evidence to support their respective interpretations of the disputed contract provision.  The Second Lease Amendment allowed Koll/Intereal Portland to divide the leased property into parcels that it could assign to others.

27.  Pursuant to the Second Lease Amendment, the leased

22  - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

property was divided into two parcels.  The Second Lease
Amendment decreased the total acreage of the leased premises from
44.6 acres to 29.49 Net Useable Acres and increased the value per
acre from $22,000 per acre to $30,517.72 per Net Useable Acre.
Koll/Intereal Portland assigned all of its interests in and
obligations under the Ground Lease as to one of the parcels to
Nimbus Center Associates, an Oregon joint venture.

     28.  When Koll/Intereal Portland made partial assignment of
the Ground Lease to Plaintiff Petula Associated, Ltd., a
subsidiary of Plaintiff Principal Life, the Robinsons executed a
lessor's estoppel certificate, which also recites the parties'
disagreement about the rent-adjustment clause.  Petula,
therefore, had notice of the parties' disagreement about the
interpretation of Section 2.1 when it acquired its interest in
the Ground Lease.  Indeed, Petula also considered the uncertainty
created by the Robinsons' interpretation of Section 2.1 as a
factor when it decided to accept an assignment of the Ground
Lease.  When Principal Life acquired its interest in the Ground
Lease, it did not make any projections about the rental amount
after 2007 and believed the Ground Lease was a good investment
regardless of the method used to calculate the rental amount in
2007.

     29.  Between 1996 and 1998, the three Plaintiffs became the
sole lessees.

23 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

## CONCLUSIONS OF LAW

Based on the Court's factual findings, the Court reaches the following conclusions of law:

**A.    Antecedent Agreement**.

As noted, the evidence is insufficient to permit the Court to find by clear and convincing evidence that Brandt ever accepted William Robinson's view that rent adjustment in the 31st and 61st years of the Ground Lease should also be based on a re-evaluation of the fair-market value of the land.

The Court concludes, therefore, the Robinsons have failed to establish the existence of an antecedent agreement that would allow reformation of the Ground Lease. *See Manning Lumber Co. v. Voget*, 188 Or. 486, 500 (1950).

**B.    Mutual Mistake or Unilateral Mistake**.

**1.    Mutual Mistake**.

The Court is convinced William Robinson made a fundamental mistake in believing both the Agreement and the Ground Lease accomplished his intent to re-evaluate the per-acre value of the land in the 31st and 61st years of the Ground Lease.  As noted, however, the record does not contain evidence to permit the Court to find by clear and convincing evidence that Brandt shared William Robinson's belief and, therefore, that a mutual mistake existed only "in the drafting of the instrument and not in the making of the contract." *See Interior Elevator Co. v. Limmeroth*,

24 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

278 Or. 589, 597 (1977).

Accordingly, the Court concludes the Robinsons have failed to establish by clear and convincing evidence that there was a mutual mistake about the final terms of the Ground Lease.

    **2.    Unilateral Mistake**.

Although the Court is convinced William Robinson made a fundamental mistake, there is not any evidence in the record to permit the Court to find by clear and convincing evidence that Brandt knew or should have known that William Robinson had made a mistake about the language of the Ground Lease at the time the Ground Lease was negotiated and signed. *See Gardner v. Meiling*, 280 Or. 665, 674 (1977).  Moreover, the mere fact that Brandt earned a significant commission on the original transaction is insufficient to show Brandt knew about William Robinson's mistake and took advantage of it.  Thus, the record does not reflect that Brandt, as the non-mistaken party, engaged in any kind of inequitable conduct by knowing that William Robinson mistakenly executed the Ground Lease.  *See Jensen v. Miller*, 280 Or. 225, 228-29 (1977).

Accordingly, the Court concludes the Robinsons have not established by clear and convincing evidence that there was a unilateral mistake on the part of William Robinson accompanied by inequitable conduct by Brandt.

**D.**   __Lack of Gross Negligence on the Part of the Lessors__.

Although the Court is convinced William Robinson signed the Ground Lease under a mistaken belief that it expressed his true intent, the Court is not persuaded that this act "amount[ed] to a degree of inattention that is inexcusable under the circumstance[s]." *See Foster v. Gibbons*, 177 Or. App. 45, 54 (2001).  Indeed, the proper legal interpretation of the Ground Lease was not settled until this Court granted Plaintiff's Motion for Summary Judgment on February 27, 2006.

Although it does not affect the outcome of this matter, the Court concludes the Robinsons have shown by clear and convincing evidence that William Robinson was not grossly negligent.

## CONCLUSION

For these reasons, the Court renders its Verdict in favor of Plaintiffs as to the Robinsons' First and Second Counterclaims.

IT IS SO ORDERED.

DATED this 29[th] day of November, 2006.

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge

26 - VERDICT, FINDINGS OF FACT, AND CONCLUSIONS OF LAW